UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BRENDA MOHLER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-1162-RLY-WTL |
| | ) | |
| STANDARD INSURANCE COMPANY, | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT
AND MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM**

## I.    Introduction

Plaintiff Brenda Mohler ("Mohler") filed this action on April 8, 2005, in the

Marion Circuit Court against Standard Insurance Company ("Standard") arising out of a

dispute regarding Standard's denial of Mohler's long term disability insurance claim.  On

August 5, 2005, Standard removed the action to this court.[1]  Mohler's complaint alleges

that because Standard denied her disability claim, Standard (1) breached the insurance

contract, (2) breached the covenant of good faith and fair dealing, and (3) caused her

emotional distress.  (Complaint ¶¶ 17–18).  Standard filed a counterclaim on June 10,

2005, seeking reimbursement from Mohler in the amount of $19,818.50 for overpayment

---

[1]In Mohler's complaint, she alleges that the amount in controversy does not exceed
$75,000.  However, in its notice of removal, Standard alleges that the amount in controversy
does exceed $75,000 because, pursuant to her affidavit, Mohler seeks long term disability
benefits, which exceed $90,000.  Mohler filed no objection to the notice of removal, nor did she
file a motion to remand.  Because the court finds that Mohler would be entitled to an award in
excess of $75,000 if she prevailed on her claims, the court properly has diversity jurisdiction.

of benefits.  Standard alleged that pursuant to her insurance policy, Mohler was required

to reimburse Standard for the social security benefits that she received while also

receiving disability benefits from Standard.  (Counterclaim ¶¶ 2–4).  On May 5, 2006,

Standard filed its motion for partial summary judgment on Mohler's bad faith and

emotional distress claims and a motion for summary judgment on its counterclaim for

reimbursement of $19,818.50 for overpayment of benefits.

For the reasons set forth below, the court **GRANTS** Standard's motion for partial

summary with respect to Mohler's bad faith and emotional distress claims.  The court

**DENIES** Standard's motion for summary judgment on its counterclaim for

reimbursement.

## II.    Statement of Facts[2]

### Employment and Policy Background

1.      Mohler was employed as a human resource specialist at Indiana University Purdue

University at Indianapolis ("IU-PUI").  (Deposition of Brenda Mohler ("Mohler

Dep.") at 15, Standard Ex. B).  Her basic annual wage was $32,800.  (Standard

---

[2]The court recognizes that Standard's Motion to Exclude the Testimony and Opinions of
John Sargent and Motion to Partially Exclude the Testimony and Opinions of Dr. Hake and Dr.
Hugenberg remain.  In ruling on Standard's motion for partial summary judgment, the court does
not rely on any of the testimony that is at issue in those motions.  With respect to the disputed
deposition testimony of Dr. Hake and Dr. Hugenberg, the court finds such evidence irrelevant in
determining whether Standard breached its duty to act in good faith in denying Mohler's claim.
Rather, the relevant evidence, which the court considers, is the claim file on which Standard
based its denial of Mohler's claim.  With respect to the opinion of John Sargent, Mohler did not
present his opinion as evidence in her response to Standard's partial summary judgment motion.
Thus, the court does not consider it.  In a separate entry filed contemporaneously with this Entry,
the court addresses the merits of Standard's motions to exclude.

Claim File at STND709-00821, Standard Ex. A) ("Record at 821").

2.  Her position generally involved interviewing and doing paperwork for the hiring process, record-keeping, supervising, setting up new offices, disciplining, and maintaining accounts payable and receivable.  (Mohler Dep. at 16).

3.  Mohler's last day of work with IU-PUI was August 6, 2002.  (Record at 205). Mohler has not been employed since that time.  (*Id*. at 338).

4.  During the relevant time period in this case, Mohler was covered under a disability insurance policy issued by TIAA.  (*Id*. at 204).  Standard is the administrator for TIAA.  (*Id*. at 703).  TIAA initially handled Mohler's disability insurance claim. (Deposition of Diana Omess ("Omess Dep.") at 26–27, Standard Ex. C).  Standard took over Mohler's claim in May, 2003.  (*Id*.).

**Mohler's Disability Insurance Policy**

5.  Mohler's insurance policy defines disability as being completely unable to perform the essential duties of one's *normal occupation* due to "sickness, bodily injury, or pregnancy" for a period of two years plus the initial elimination period, and after that, being unable to perform the essential duties of *any occupation* for which one is qualified due to "sickness, bodily injury, or pregnancy."  (Record at 165) (emphasis added).

6.  Proof of disability as defined in Mohler's policy includes "statements of treating physicians; copies of test reports or examinations; hospital records; medical examinations by impartial specialists at TIAA's expense; [and] investigations

conducted by TIAA or outside agencies." (*Id*. at 168).

7.    Mohler's policy provides that any social security benefit will be subtracted from the monthly insurance benefit. (*Id*. at 21). In the event that TIAA does not subtract the social security award from the monthly insurance payout, the policy provides that the insured must make reimbursement for the overpayment. (*Id*. at 9).

**Fibromyalgia and Chronic Fatigue Syndrome**

8.    Fibromyalgia is a syndrome characterized by pain in the muscles and connective tissues. (Deposition of Dr. Ann Marie Hake ("Hake Dep.") at 7, Standard Ex. E). It is typically diagnosed by a patient's complaints of pain in certain areas. (*Id*.). The cause of fibromyalgia is unknown, and no definitive tests exist to diagnose the syndrome. (*Id*. at 10).

9.    Due to the lack of objective tests available to diagnose fibromyalgia, controversy exists among doctors as to whether it is a true disease. (*Id*. at 7–8).

10.    Chronic fatigue syndrome is a syndrome closely related to fibromyalgia. (*Id*. at 8). Chronic fatigue syndrome is characterized by severe fatigue, so intense that some people may not be able to get out of bed. (*Id*.). Like fibromyalgia, the cause of chronic fatigue syndrome is unknown and no definitive tests exist to diagnose it. (*Id*. at 9–10).

11.    Doctors also disagree about the existence of chronic fatigue syndrome. (*Id*. at 9).

**Medical and Disability Insurance Claim History**

12. For many years preceding Mohler's disability claim with Standard, she experienced undiagnosed musculoskeletal pains, including chest pains, limb pain, and other muscle pains. (Record at 547–48).

13. In an attempt to establish the cause of these pains, Mohler saw Dr. Dennis Ang, a rheumatologist, on March 1, 2002, to rule out connective tissue disorder. (*Id*. at 321, 767A). Dr. Ang assessed that Mohler's symptoms were consistent with fibromyalgia and subclinical depression. (*Id*. at 767). The results of a tilt table test ordered by Dr. Ang also indicated that Mohler had orthostatic hypotension, a condition where a person's blood pressure drops when assuming an upright position. (*Id*. at 472–73; Hake Dep. at 13).

14. On May 2, 2002, Mohler saw her primary treating physician at that time, Dr. Brenda O'Hara, for complaints of migraines and dizziness. (Record at 506). Dr. O'Hara's report stated that Mohler was dehydrated and orthostatic from the overuse of diuretics. (*Id*. at 505). Dr. O'Hara suggested that Mohler reduce her use of diuretics, which Mohler used to treat edema, and her other medications. (*Id*.). During this visit, Dr. O'Hara also discussed a possible diagnosis of fibromyalgia and chronic fatigue syndrome with Mohler. (*Id*.).

15. On July 11, 2002, Mohler went to Dr. O'Hara for a follow-up visit to her MRI, which was performed on July 1, 2002. (*Id*. at 507). The MRI results were normal. (*Id*. at 766). Dr. O'Hara assessed that Mohler suffered from fibromyalgia and

5

chronic fatigue syndrome.  (*Id*. at 507).

16.  Due to a worsening of her fatigue, muscle ache, and dizziness, Mohler saw Dr. O'Hara on August 8, 2002.  (*Id*. at 509).  During that appointment, Dr. O'Hara suggested that Mohler stop working for a period of time to see how much her symptoms were due to stress.  (*Id*.).  Dr. O'Hara also noted that she was going to refer Mohler to a neurologist for evaluation.  (*Id*.).

17.  On September 11, 2002, Mohler returned to Dr. O'Hara for a follow-up visit.  (*Id*. at 511).  Dr. O'Hara noted that Mohler said she was doing well but that she was still extremely fatigued, despite her time off work.  (*Id*.).

18.  On October 18, 2002, Mohler submitted an application for long term disability benefits.  (*Id*. at 784–95).  In the following weeks, TIAA requested medical records from the doctors that had seen Mohler about her symptoms and prepared a review of Mohler's file, noting the diagnoses of "chronic fatigue, fibromyalgia, chest pain, and Hypotensive [sic]."  (*Id*. at 321, 454–59).

19.  On October 28, 2002, Mohler completed an Activities of Daily Living Questionnaire for TIAA.  (*Id*. at 803–06).  In that questionnaire, Mohler described her daily routine: waking up around 7:00 a.m., lying in bed for an hour before getting up, lying on the sofa, having lunch with her husband, taking a nap, sometimes going for a short walk and then returning home to rest, watching television, reading for fifteen to twenty minutes, then going to bed.  (*Id*. at 806). Mohler described her symptoms as "weak, tired, dizzy, faint, fall, vomiting, severe

pain." (*Id*. at 803).

20.   By October 29, 2002, Mohler had been examined by Dr. Ann Marie Hake, a
      neurologist, who reported that Mohler's symptoms were consistent with
      fibromyalgia. (Record at 776–78). However, Dr. Hake reported that Mohler's
      neurological exam was normal, except for mild unsteadiness when Mohler first
      stood. (*Id*. at 776).

21.   On November 7, 2002, Dr. O'Hara filled out a TIAA physical capacities form in
      which she reported that Mohler could only stand, sit, walk, and drive one to three
      hours, non-continuously, out of eight hours each day. (*Id*. at 519). Dr. O'Hara
      also commented that Mohler was only able to do activities of self-care and should
      not perform any activities requiring full cognitive ability. (*Id*.).

22.   On December 10, 2002, Mohler returned to Dr. O'Hara for a follow-up visit. (*Id*.
      at 779). Mohler reported that one of the medications Dr. O'Hara had prescribed,
      Provigil, had temporarily improved her symptoms but that it became less effective.
      (*Id*.). Mohler's neurological exam was normal. (*Id*.). Dr. O'Hara again reported
      that Mohler's symptoms were consistent with fibromyalgia. (*Id*.).

23.   Pursuant to a request by TIAA, Dr. Saad Al-Shathir, a physician specializing in
      physical medicine and rehabilitation, completed a peer review of Mohler's medical
      records on January 13, 2003. (*Id*. at 629–32). Dr. Al-Shathir observed that (1)
      Mohler's tests were normal, except for the positive tilt table test indicating
      orthostatic hypotension, (2) her medication did not support her pain level and her

7

lack of exercise contributed to her condition, and (3) her complaints of memory problems were not supported by the medical tests.  (*Id.* at 630–31).  He concluded that Mohler did not have a disabling disease, noting that fibromyalgia does not preclude most individuals from working, and that she had the capacity to be "gainfully employed in any occupation of her choice."  (*Id.*).

24.    On February 4, 2003, in response to Dr. Al-Shathir's peer review, Dr. O'Hara affirmed her opinion of Mohler's condition, noting that a doctor who had only reviewed Mohler's medical record, but had not physically examined her, would be unable to evaluate her from a "biopsychosocial model of disease perspective," and attached a number of medical articles on fibromyalgia as support.  (*Id.* at 750–52). Dr. O'Hara emphasized that objective medical tests to diagnose fibromyalgia do not exist, but, nonetheless, fibromyalgia is "widely accepted to cause permanent disability."  (*Id.* at 752).

25.    TIAA approved Mohler for long term disability benefits on February 13, 2003, effective November 4, 2002.  (*Id*. at 818–21).  TIAA deducted estimated social security from Mohler's monthly award.  (*Id*. at 821).  However, Mohler had been denied social security disability benefits on January 28, 2003.  (*Id*. at 833). Therefore, TIAA stopped deducting an estimated social security benefit from Mohler's monthly insurance benefit, and it repaid her the estimated social security withheld for the previous months.  (*Id*. at 837).

26.    On March 27, 2003, Mohler saw Dr. Waqas Ghumman, a cardiologist, for

complaints of chest pain and shortness of breath. (*Id.* at 409). While Mohler had experienced similar symptoms in the past, she had experienced continuous symptoms in the previous three weeks that felt like someone was "sitting on her chest." (*Id.*). In the months following her initial visit, Mohler saw Dr. Ghumman twice for follow-up visits. (*Id.* at 410, 414). The results of Mohler's chest tests were normal, and she reported during both exams that she was no longer experiencing chest pain. (*Id.* at 411, 413–14).

27. On April 29, 2003, and July 29, 2003, Mohler saw Dr. Hake for follow-up visits about her symptoms of sleepiness, fatigue, mental clouding, and pain. (*Id.* at 696, 698). After both exams, Dr. Hake's diagnosis of fibromyalgia remained unchanged. (*Id.*).

28. Mohler next saw Dr. Hake on November 18, 2003. (*Id.* at 695). At this examination, Mohler stated that her symptoms had worsened—she had more frequent headaches and dizzy episodes, neck and back pain, and more severe fatigue. (*Id.*). Mohler also reported that at times she lost consciousness when she sat down to relieve her dizzy spells, then waking up after vomiting or incontinence. (*Id.*). In addition to reaffirming her impression of fibromyalgia, Dr. Hake also became concerned about whether Mohler was experiencing actual seizures. (*Id.*).

29. On December 26, 2003, Dr. O'Hara completed a Permanent and Total Disability Benefits Attending Physician's Statement for Standard. (*Id.* at 701–03). On this

form, Dr. O'Hara listed Mohler's diagnoses as: orthostatic intolerance (neurally mediated), seizures, syncope, renal failure, chronic fatigue syndrome, and fibromyalgia. (*Id*. at 703). In response to the question of Mohler's disability, Dr. O'Hara checked the box stating that Mohler was disabled from both her own and any occupation. (*Id*. at 702).

30. On January 6, 2004, the Indiana University insurance plans administrator submitted Mohler's applications for Total & Permanent Disability and Waiver of Premium benefits. (*Id*. at 856).

31. Mohler's current family physician, Dr. Gaylen Kelton, completed a Standard medical questionnaire on March 5, 2004. (*Id*. at 771–72). This was the first time that Dr. Kelton examined Mohler, as Mohler's previous primary care physician, Dr. O'Hara, had moved away. (*Id*. at 422). Dr. Kelton's diagnoses included chronic fatigue, orthostatic hypotension, and chronic renal insufficiency. (*Id*. at 772). He listed Mohler's performance percentage as a fifty—"requires considerable assistance and frequent medical care"—and commented that she was unable to return to work. (*Id*. at 771, 772).

32. Mohler's rheumatologist, Dr. Steven Hugenberg, also completed a Standard medical questionnaire for Mohler signed March 11, 2004. (*Id*. at 342–43). He listed Mohler's diagnosis as fibromyalgia and her performance at seventy percent, signifying that she was able to care for herself but unable to do active work. (*Id*. at 342). The questionnaire also stated that Mohler was able to sit for three hours and

10

walk or stand for two hours during a work day. (*Id.* at 343). Under "anticipated return to work date," Dr. Hugenberg wrote "unknown." (*Id.* at 342).

33. Dr. Ghumman, Mohler's cardiologist, filled out a similar questionnaire also signed March 11, 2004. (*Id.* at 415). On a performance scale, he ranked Mohler between seventy percent—"cares for herself but unable to do active work"—and eighty percent—"normal activity with effort with some signs or symptoms of disease." (*Id.*). Dr. Ghumman commented that Mohler could work if she was allowed to sit with her feet elevated, wear support stockings, and not have to stand for prolonged periods. (*Id.*). His questionnaire stated that Mohler could sit for twelve hours and stand or walk for one hour out of the workday. (*Id.* at 406).

34. Dr. Hake, Mohler's neurologist, filled out Standard's medical questionnaire on March 23, 2004. (*Id.* at 784–85). Her diagnosis was similar to that of Mohler's other physicians—chronic fatigue syndrome and orthostatic hypotension. (*Id.* at 785). Dr. Hake listed Mohler's performance at sixty percent—"requires occasional assistance but is able to care for most personal needs." (*Id.* at 784). Dr. Hake also noted that Mohler was unable to remain upright due to low blood pressure and would be unable to return to work. (*Id.* at 784, 785).

35. On April 15, 2004, after receiving medical questionnaires from Mohler's physicians, Standard requested a medial review of Mohler's file to determine whether she was disabled from performing any occupation, in essence, whether she was permanently disabled. (*Id.* at 335).

11

36.    On April 29, 2004, Dr. Richard Handelsman, a board-certified physician of internal medicine and a paid consultant for Standard, completed his review of Mohler's medical file for Standard.  (*Id*. at 337–38; Deposition of Dr. Richard Handelsman ("Handelsman Dep.") at 11, 18, Standard Ex. I).  His review included a short summary of Mohler's medical history and the opinions of Drs. Ang, O'Hara, Hake, Al-Shathir, Kelton, and Hugenberg.  (Record at 337–38).  Dr. Handelsman concluded that Mohler had work capacity, but based upon her subjective complaints, she could not return to work.  (*Id*. at 337).  He recommended an Independent Medical Examination ("IME") with a board-certified rheumatologist, a Functional Capacities Evaluation ("FCE"), and an activity check.  (*Id*.).

37.    On May 21, 2004, the Social Security Administration ("SSA") reversed its earlier decision and awarded Mohler social security disability benefits.  (*Id*. at 429).  The decision stated that Mohler's impairments, while severe, did not alone meet the disability requirements set forth in the federal regulations.  (*Id*. at 430–31).  However, the SSA further considered Mohler's "mental and physical residual functional capacity" and determined that she was "unable to do sustained work activities in an ordinary work setting on a regular and continuing basis."  (*Id*. at 431).

38.    On July 22, 2004, a Standard representative spoke with Mohler about her claim status.  (*Id*. at 876).  During this conversation, the representative told Mohler that

Standard was waiting on an FCE to be performed because all of Mohler's tests were normal and her disability was based upon her subjective complaints only. (*Id*.).  In addition, Mohler informed the representative that the SSA had already confirmed that she was unable to work after a vocational review and that she would have her social security lawyer forward the records the SSA used in its evaluations.  (*Id*.).  On August 24, 2004, a Standard representative left a message for Mohler informing her that Standard had not yet received the social security records from her attorney.  (*Id*. at 877).

39.    Dr. Hake examined Mohler on August 27, 2004, at which time she was urgently referred to her family physician for symptoms of heart failure.  (*Id*. at 403).  Dr. Hake also noted that Mohler continued to suffer from the same symptoms that she had been continually experiencing, including fatigue and diffuse pain.  (*Id*.).  In a follow-up examination on September 17, 2004, Dr. Hake noted that Mohler's cardiac tests came back normal but that her fibromyalgia remained under inadequate control.  (*Id*. at 401).

40.    After a group claim review conducted by Standard on October 27, 2004, concluded that Mohler's file should again be reviewed by Dr. Handelsman, Dr. Handelsman contacted Drs. Hake and Hugenberg.  (*Id*. at 878, 345).  The telephone records in Mohler's insurance file entered by Dr. Handelsman indicated that both Dr. Hake and Dr. Hugenberg had told him that Mohler could work in a sedentary capacity. (*Id*. at 346).

41.     After Mohler learned of these statements by her physicians, she contacted their

offices.  (*Id.* at 885; Deposition of Dr. Steven Hugenberg ("Hugenberg Dep.") at

Ex. J, Standard Ex. F).  Notes from a telephone call on January 4, 2005, between

Mohler and a Standard representative indicate that, per Mohler, no one at Dr.

Hake's office had spoken with Dr. Handelsman and that Dr. Hake never said

Mohler could return to work.[3]  (Record at 885).

42.     Standard sent Mohler a letter on December 21, 2004, stating that her medical

records did not support her claim of disability but that she had thirty days to

provide additional medical information that would otherwise support her claim.

(*Id.* at 881).  Standard cited the fact that all of Mohler's medical test results were

normal and that Mohler's neurologist, Dr. Hake, and rheumatologist, Dr.

Hugenberg, stated that she could work full-time in a sedentary occupation.  (*Id.* at

880–81).

43.     Mohler responded on January 4, 2005, with documentation of the favorable SSA

decision awarding her disability benefits.  (*Id.* at 439–41).  She also included

---

[3] There was also some dispute about whether Dr. Hugenberg made the statement to Dr. Handelsman regarding Mohler's ability to work in a sedentary capacity.  A letter signed by Dr. Hugenberg dated July 19, 2005, stated that Dr. Hugenberg did not recall having the conversation with Dr. Handelsman and that Dr. Hugenberg continued to support the position that she was unable to work.  (Hugenberg Dep. at Ex. J).  However, during his deposition, Dr. Hugenberg did not recall writing this letter.  (Hugenberg Dep. at 76).  Following the deposition, Dr. Hugenberg then submitted an affidavit explaining the discrepancy.  (Affidavit of Steven T. Hugenberg, M.D. ("Hugenberg Aff."), Mohler Ex. A).  He stated that Mohler had drafted the July 19, 2005, letter, which he signed, but during his deposition, he had forgotten about that situation.  (*Id.*).  Only after Mohler reminded him after his deposition that he had signed the letter she drafted, did he remember reading and signing the letter.  (*Id.*).

additional medical records from her family physician, Dr. Gaylen Kelton, notes

and records from Drs. Ghumman and Hake, and a letter from Dr. O'Hara.  (*Id*. at

440–41).  All of the documentation, with the exception of Dr. Ghumman's

statement that Mohler could work if she elevated her feet and used support

stockings, indicated that Mohler's condition had not improved and she was unable

to work.  (*Id*. at 439–40).

44.    Dr. Kelton examined Mohler on January 7, 2005.  (*Id*. at 422).  He continued to

opine that she was unable to work and noted that her condition was likely to

deteriorate.  (*Id*. at 419).  There is no evidence in the record that Standard

contacted Dr. Kelton before conclusively denying her claim in February, 2005.

45.    On January 13, 2005, Standard sent Mohler a letter stating that she owed Standard

$21,084.00 pursuant to her insurance policy as a reimbursement for the

overpayment of disability benefits that accrued when Mohler received full

disability insurance benefits and social security benefits at the same time.  (*Id*. at

890).  The letter stated that, although Mohler advised Standard that she had told a

Standard representative about the award on May 28, 2004, the award information

may have been overlooked.  (*Id*.).  Thus, her monthly insurance benefit was not

recalculated.  (*Id*.).

46.    Dr. Handelsman submitted his report on January 20, 2005, in response to the

request arising out of Standard's group claim review held on October, 27, 2004.

(*Id*. at 349).  The report referenced the calls he made to Drs. Hake and Hugenberg,

15

including their alleged statements certifying that Mohler could work in a sedentary capacity, although the report indicates the Dr. Hake later told him that Mohler could not remain upright. (*Id.* at 348). There is no evidence in the record that Standard attempted to clarify this apparent discrepancy in Dr. Hake's opinion. Dr. Handelsman's report concluded that there was no medical information that would preclude Mohler from working full-time in a sedentary position. (*Id.*).

47.    On February 3, 2005, Standard advised Mohler that the additional documentation still did not establish that she was disabled. (*Id.* at 892–94). Therefore, her disability claim for continuing benefits under the "any occupation" provision of her policy was denied, and her benefits would be terminated effective February 25, 2003. (*Id.* at 894). Standard concluded, based on Mohler's medical records and insurance file, that Mohler was able to work a fulltime sedentary occupation "with the restrictions and limitations of no prolonged standing or walking without the ability to rest, and ability to sit and elevate legs if needed and ability to wear stockings," even though the majority of Mohler's physicians agreed that she was unable to work. (*Id.* at 893).

## III.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). When ruling on a summary

16

judgment motion, a court may consider any material that would be admissible at trial.

*Aguilera v. Cook County Police and Corrs. Merit Bd.*, 760 F.2d 844, 849 (7th Cir. 1985).

A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Some alleged factual dispute that does not rise to a genuine issue of material fact will not alone defeat a summary judgment motion. *Id*. at 247–48. "In ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id*. at 254. In deciding whether a genuine issue of material fact exists, the court views the evidence and draws all inferences in favor of the nonmoving party. *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).

## IV.   Discussion

### A.   Breach of Duty of Good Faith and Fair Dealing

Under Indiana law, an insurer has a duty to deal in good faith with its insured. *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002). The duty of good faith requires that insurers do not (1) make unfounded refusals to pay policy proceeds, (2) cause unfounded delays in making payments, (3) deceive the insured, or (4) exercise any unfair advantage to pressure policy holders to settle their claims. *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 519 (Ind. 1993). The Indiana Supreme Court stressed that a cause of action in tort for breach of the duty of good faith does not arise every time an insurer erroneously denies an insurance claim. *Id*. at 520. For example, a good faith

dispute about whether the insured has a valid claim is not sufficient grounds to find bad

faith.  *Id*.  However, an insurer that denies liability with knowledge that there is no

rational, principled basis for doing so acts in bad faith.  *Id*.

### 1.     Mohler's Evidentiary Burden

The parties here dispute the substantive evidentiary burden that Mohler bears in

proving her bad faith claim.  Although the court is not to weigh the credibility of the

evidence at the summary judgment stage, the court must take into account what burden

Mohler will ultimately bear at trial to determine if there is sufficient evidence for a jury to

return a verdict in her favor.  *Anderson*, 477 U.S. at 254–55.  Mohler argues that she

would only be required to prove that Standard breached its duty of good faith by a

preponderance of the evidence.  Standard, on the other hand, argues that Mohler must

prove her bad faith claim by clear and convincing evidence.

The Indiana Supreme Court first recognized a cause of action for an insurer's

tortious breach of the duty of good faith in *Erie Insurance Co. v. Hickman*.  622 N.E.2d at

519.  Although the Court did not specifically set forth the evidentiary burden required for

the new cause of action, it implied that it was a preponderance of the evidence standard.

*Id*. at 520 ("[T]he mere finding by a preponderance of the evidence that the insurer

committed the tort will not, standing alone, justify the imposition of punitive damages.").

However, in *Freidline v. Shelby Insurance Co.*, the Indiana Supreme Court stated:

"To prove bad faith, the plaintiff must establish, with clear and convincing evidence, that

the insurer had knowledge that there was no legitimate basis for denying liability."  774

18

N.E.2d at 40.  Since *Freidline*, courts have consistently applied the clear and convincing standard to tort claims for bad faith.  *See, e.g.*, *Masonic Temple Ass'n of Crawfordsville v. Ind. Farmers Mut. Ins.*, 779 N.E.2d 21, 26 (Ind. Ct. App. 2002); *Clark v. State Farm Mut. Auto. Ins. Co.*, No. 1:05-cv-0822-JDT-TAB, 2005 WL 3071553, at *6 (S.D. Ind. Nov. 14, 2005); *KK, LLC v. U.S. Aviation Underwriters, Inc.*, No. 1:02-cv-1992-TAB-RLY, 2005 WL 1115864, at *5 (S.D. Ind. May 6, 2005); *Odom v. State Farm Ins. Cos.*, No. 2:05-cv-97-RL, 2006 WL 1660754, at *5 (N.D. Ind. June 14, 2006).  *But see Lummis v. State Farm Fire & Cas. Co.*, No. 1:04-cv-0080-DFH-VSS, 2005 WL 1875771, at *1–*3 (S.D. Ind. Aug. 8, 2005).  Therefore, this court will consider the clear and convincing standard in deciding whether Mohler has sufficient evidence to overcome summary judgment.

### 2.    The Merits of Mohler's Bad Faith Claim

Defendant in this case argues that its denial of Mohler's disability claim does not amount to bad faith because it had a rational and principled basis for its decision.  Namely, Defendant argues that it relied on the opinions of Dr. Al-Shathir, Dr. Handelsman, and Dr. Ghumman as a basis for concluding that Mohler was not disabled under the policy definitions.  Both Dr. Al-Shathir and Dr. Handelsman concluded, after reviewing Mohler's medical records, that no medical information precluded her from working.  In their opinions, her complaints of pain did not equate with the results of her medical tests, and her test results did not indicate any condition that would prevent her from working in a sedentary capacity.  Dr. Ghumman, Mohler's cardiologist, stated that she could work full-time in an inactive occupation if she elevated her feet and wore

19

support stockings.  Although not cited as a reason for denying her claim, Standard also emphasizes the fact that Mohler had been experiencing symptoms of fibromyalgia for a number of years preceding her disability claim.  The ability of Mohler to work with these symptoms, Standard opines, is further evidence that she is not disabled.

On the other hand, Mohler argues that Defendant completely ignored the opinions of her treating physicians, who repeatedly confirmed that she suffered from fibromyalgia and was unable to work due to her debilitating symptoms.  Mohler argues that Dr. Handelsman's opinion was based primarily on disputed telephone conversations he had with Dr. Hake and Dr. Hugenberg, where Dr. Handelsman stated that those doctors agreed that Mohler could work full-time in a sedentary capacity.  Otherwise, his opinion seemed to state that because Mohler could provide no objective medical tests to verify the severity of Mohler's pain, nothing prevented her from working.  Mohler argues, however, that her insurance policy does not have an objective medical evidence requirement, and as such, Standard cannot deny her disability claim on that ground.  In addition, Mohler points to the fact that Standard neither conducted an IME or an FCE, even after Dr. Handelsman's recommendation in his first file review for Standard, before it made its final decision to deny her claim.

The evidence in this case indicates a clear dispute between the physicians that treated Mohler and those that reviewed her file for Standard.  The majority of physicians that examined Mohler on a regular basis came to the conclusion that Mohler was unable to return to work because her pain would prevent her from doing so.  On the other hand,

20

the physicians hired by Standard's predecessor on the claim, TIAA, and Standard itself,

both concluded, after reviewing Mohler's medical file, that there was no medical

information that would preclude her from working.  However, simply because Standard's

doctors did not examine Mohler does not mean that the court can discount those opinions.

*See Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577 (7th Cir. 2006) ("In such file

reviews doctors are fully able to evaluate medical information, balance the objective data

against the subjective opinions of the treating physicians, and render an expert opinion

without direct consultation.").

On the same note, the fact that Dr. Al-Shathir and Dr. Handelsman reviewed

Mohler's file for TIAA and Standard also does not mean that their opinions are

automatically biased.  *See id*. at 575.  There is no evidence here that either doctor had an

outcome-specific stake in Mohler's case, such as receiving more money upon the denial

of her claim, that would give Mohler a legitimate argument of bias.  *See id*.  Although

these facts indicate a dispute between the physicians involved with Mohler's case, a good

faith dispute about whether an insured has a valid claim is not evidence of bad faith.  *Erie*

*Ins. Co.*, 622 N.E.2d at 520.

Besides the opinions of its consulting physicians, Defendant also states that it

relied on the opinion of Dr. Ghumman, Mohler's cardiologist.  Contrary to Mohler's other

treating physicians, Dr. Ghumman stated that Mohler could work full-time as long as she

was able to elevate her feet and wear support stockings.

Further, at the time that Standard made the final decision to deny Mohler's claim,

21

Dr. Handelsman had reported that two of Mohler's other doctors, Dr. Hake and Dr. Hugenberg, said Mohler could work full-time.  Although those doctors' statements are now in dispute, the relevant time period is when Standard made the decision to deny Mohler's disability claim.  The evidence shows that during the period when Standard made its final decision, Dr. Hugenberg's statement was not disputed, and Dr. Hake reportedly made inconsistent statements—first, that Mohler could work full-time, then that Mohler could not even sit upright.  Perhaps Standard should have contacted Mohler's physicians to clarify the apparent inconsistencies, but the court does not find that its failure to do so amounted to bad faith.  Considering these facts in the light most favorable to Mohler, the court finds that Mohler's evidence is insufficient for a jury to conclude upon clear and convincing evidence that Defendant had no rational, principled basis to deny her disability claim and thus breached its duty of good faith in making that decision.

The court does not give any credence to the argument that because Mohler was working with symptoms of fibromyalgia before she filed her disability claim, she is not disabled.  The Seventh Circuit rejected this argument in a similar case involving a disability claimant with fibromyalgia.  *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003).  Judge Posner stressed that there is not a logical incompatibility between working full-time and being disabled from working full-time, namely because a desperate person may force herself to work even through debilitating pain.  *Id*.  At some point, however, a person may not be able to continue working.  *Id*.  As the Court emphasized: "A disabled person should not be punished for

22

heroic efforts to work by being held to have forfeited his entitlement to disability benefits should he stop working." *Id*.

Likewise, the court rejects Mohler's arguments that Standard employed an objective evidence requirement and that it acted in bad faith by failing to conduct an IME and FCE. The lack of medical tests supporting Mohler's complaints of pain was only one factor that Standard considered in denying Mohler's claim. It did not cursorily deny Mohler's claim simply because the medical tests did not support it. Rather, the undisputed evidence indicates that Standard conducted over a two-year long investigation of Mohler's case, referring her file twice to their consulting physician and having a "round-table" discussion regarding whether Mohler met Standard's disability requirements.

Additionally, Standard's failure to conduct an IME or FCE before the denial of Mohler's claim does not amount to bad faith. Standard states that it did not conduct those examinations after it learned that Mohler's physicians reported that she could work full-time. In hindsight, perhaps Standard should have clarified her physicians' statements when it learned of an apparent discrepancy from Mohler, but as discussed above, this failure does not amount to bad faith.

Accordingly, Standard is entitled to judgment as a matter of law on Mohler's claim for breach of good faith and fair dealing, as no genuine issue of material fact exists. Thus, the court **GRANTS** Standard's motion for summary judgment on Mohler's bad faith claim.

**B.     Emotional Distress**

Standard also moves for summary judgment on Mohler's emotional distress

claims.  Mohler did not address her emotional distress claim in her response brief.

Therefore, the court finds that Mohler waived her argument, and the court **GRANTS**

Standard's motion for summary judgment on Mohler's emotional distress claim.

**C.     Standard's Counterclaim for Reimbursement and Waiver**

Standard also seeks summary judgment on its counterclaim for reimbursement of

overpayment of benefits due to Mohler's concurrent receipt of social security and

disability insurance.  Mohler claims that Standard waived the portion of her insurance

policy entitling Standard to the reimbursement.

The interpretation of an insurance policy, under Indiana law, is a question of law.

*Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992).  However, waiver of a contractual

provision is typically a question of fact.  *Van De Leuv v. Methodist Hosp. of Ind., Inc.*,

642 N.E.2d 531, 533 (Ind. Ct. App. 1994).  "Waiver is an intentional relinquishment of a

known right involving both knowledge of the existence of the right and the intention to

relinquish it."  *Id.*

There is no dispute in this case that Mohler's insurance policy provided for the

reimbursement of benefits in the event that she received social security disability.

However, there is a dispute about whether Standard waived the policy provision allowing

for reimbursement.  The disputed evidence shows that Mohler notified Standard in May

2004 that she was awarded social security disability.  This was about a week after Mohler

received the favorable decision from the Social Security Administration.  A telephone call in July 2004 also reflects Standard's knowledge that Mohler was receiving social security disability.

Standard argues that it did not waive reimbursement but simply that it could not deduct the social security benefit without documentation of the exact amount Mohler was receiving.  It argues that as soon as Mohler sent documentation of the award in January 2005 it sought reimbursement for the amount.  However, the evidence also shows that when Mohler initially was awarded long-term disability in February 2003, TIAA, the insurance company for which Standard is the administrator, deducted an estimated amount of social security disability from Mohler's insurance benefit without any documentation that she was even receiving social security.  Determining the significance of these facts in deciding whether Standard intended to waive reimbursement is a question for the fact-finder.  Accordingly, the court **DENIES** Standard's motion for summary judgment on its counterclaim for reimbursement.


**V.      Conclusion**

For the reasons set forth above, the court **GRANTS** Standard's motion for partial summary judgment (Docket # 29) on Mohler's bad faith and emotional distress claims.  However, the court **DENIES** Standard's motion on its counterclaim for reimbursement (Docket # 30).  As noted above, Standard's Motion to Exclude the Testimony and Opinions of John Sargent (Docket # 33) and Motion to Partially Exclude the Testimony

and Opinions of Dr. Hake and Dr. Hugenberg (Docket # 39) remain and are addressed in

an accompanying entry.

      **It is so ordered** this 26th  day of January 2007.

                                              RICHARD L. YOUNG, JUDGE
                                              United States District Court
                                              Southern District of Indiana

Electronic Copies to:

Jack A. Kramer
HOEPPNER WAGNER & EVANS
jkramer@hwelaw.com

Bridget O'Ryan
boryan@indy.rr.com